# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JABARI-ABDU WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-2857 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE CITY OF AURORA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case began with a bang, literally. On a warm summer evening in June 2020, Sergeant Lee Catavu of the Aurora Police Department thought that he heard fireworks while on patrol in his squad car. Someone, it seems, was getting an early jump on the Fourth of July. So he went to check it out.

Before long, the officer saw a few children by a driveway in a residential neighborhood, playing with what looked like fireworks. Maybe the children were having fun, but if so, it was more fun than the law allows. Illinois law bans fireworks, and fireworks pose a special danger to children.

The officer walked up the driveway and approached the home of Jabari and Melanie Walker. Catavu told Melanie Walker that the kids needed to stop shooting fireworks. The officer walked away, but he soon spotted Jabari Walker (Melanie's husband), so he went back to the house to talk things over.

The two of them exchanged words, and the conversation took a turn for the worse. Fireworks can spin out of control. And for whatever reason, so did the interaction between Catavu and Walker.

The parties disagree about what, exactly, happened. The gist is that Catavu wanted Walker to identify himself, and Walker didn't comply. Instead, Walker went into his home, closed the door, and later emerged with his phone, and started recording.

Things deteriorated from there. Catavu arrested Walker for child endangerment and for obstructing his investigation. The charges were dropped the next day.

Walker responded by suing the City of Aurora, Sergeant Catavu, and a few officials. After discovery, the parties filed cross motions for summary judgment.

For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.

## Background

The parties filed competing statements of facts in support of their cross motions for summary judgment. *See generally* Defs.' Statement of Facts (Dckt. No. 51); Pl.'s Statement of Facts (Dckt. No. 57). The parties disagree about many of the facts. But many of the disputes don't matter because the disputed facts are immaterial.

The story begins with an officer on patrol. On June 2, 2020, Sergeant Catavu was cruising the streets of Aurora in his squad car. *See* Pl.'s Resp. to Defs.' SOF, at ¶ 25 (Dckt. No. 64). He had over a dozen years of experience with the Aurora Police Department. *Id.* at ¶ 3.

Meanwhile, Jabari Walker was enjoying a day at home with his wife, his son, and his two nephews. *Id.* at ¶ 8. Walker had spent most of the day doing maintenance on his backyard pool, while his wife Melanie watched the children play out front. *Id.* Summertime was in full swing.

As he rolled around town, Catavu heard some popping noises. Walker does not dispute that Catavu heard fireworks because he "cannot attest to what Catavu heard." *See* Pl.'s Resp. to Defs.' SOF, at ¶ 25 (Dckt. No. 64).

But the parties do disagree about what was making the noise.

Catavu contends that he heard fireworks. *Id.* at ¶ 25. He got out of his squad car and walked toward the sound. *Id.* Before long, he saw two boys standing in the street playing with what he thought were fireworks. *Id.*

Based on his experience, Catavu believed that it was "unlawful for children to be setting off fireworks" in the street. *Id.* at ¶ 26. So he began investigating potential child endangerment. *Id.* at ¶ 7.

Illinois has much stricter fireworks laws than the surrounding states, but doesn't stop neighborhoods in Chicago from sounding like the Battle of Gettysburg around the Fourth of July. There's no shortage of fireworks, but they're not legal under state law. Basically, if it's legal under Illinois law, it's not particularly dangerous, and not particularly adventurous, either.

Fireworks are great fun, until they aren't. Lots of people get hurt every year by fireworks, including serious injuries. *See* Bill Pennington, *Giants' Jason Pierre-Paul Makes First Comments Since Fireworks Accident*, N.Y. Times, Oct. 30, 2015, https://www.nytimes.com/2015/10/31/sports/football/giants-jason-pierre-paul-makes-first-comments-since-fireworks-accident.html (quoting an NFL star as saying "I'm just very fortunate that I'm alive," and "[a]s far as fireworks, they're very dangerous . . . . You shouldn't play with them," after his index finger was amputated); Daryl Khan, *Rapper 4xtra loses '2 fingers' in gruesome fireworks mishap after joking about 'blowing' somebody up*, New York Post, July 7,

2

2025, https://nypost.com/2025/07/07/us-news/rapper-4xtra-loses-2-fingers-in-gruesome-fireworks-mishap-after-joking-about-blowing-somebody-up/.

Walker offers a different version of what the kids were doing. Walker says that the kids were playing with "snaps."

Snaps are firework-like toys consisting of "[p]aper twists, with little crystals in them." *Id.* at ¶ 9; *see also* Defs.' Ex. 5, at 00:54, 1:16, 1:58 (Dckt. No. 51-5) (referring to "snaps," not fireworks).

Snaps are a much different animal than fireworks. Snaps are little twisted pieces of paper that children can throw to make a little popping sound. They aren't particularly loud. Rice Crispies might be louder.

Calling snaps "firework-like" might be a stretch. They don't have a fuse. You don't light them. You throw them. They don't really explode, either. They aren't very satisfying for adults. But snaps can give children the pleasure of throwing a small explosive device in the direction of another person.

Snaps aren't particularly dangerous. You can set them off in your fingers, without threatening life and limb. Frankly, unless you ingest the whole bag, it's hard to see how anyone could get hurt with snaps. They might be more dangerous than Rice Crispies, but not by much.

Snaps do not fall within the definition of fireworks under Illinois law. *See* 424 ILCS 30/2. The parties agree that snaps are "safe for children." *See* Defs.' Resp. to Pl.'s SOF, at ¶ 7 n.1 (Dckt. No. 62).

The big difference between snaps and fireworks adds a layer of mystery to the beginning of the story. It's hard to see how Catavu could have heard snaps while driving around in a police car. They make little popping noises, at most.

The parties disagree about a number of other facts, too, but they're not material. For example, the parties can't agree on where the children were playing. Walker says that the children were playing at the end of the Walkers' driveway, but might have been playing in the street at some point. *See* Pl.'s Resp. to Defs.' SOF at ¶ 10 (Dckt. No. 64) (citations omitted); Pl.'s Dep. Tr., at 50:16 – 51:3.

The key point is that Catavu thought that he heard fireworks, and he began investigating. But Walker says that the kids weren't playing with fireworks at all.

***Catavu's Initial Interaction with the Walkers***

Catavu approached the Walkers' home. The parties disagree about where the children were at the time. And they disagree about where Walker was, too. But once again, it's immaterial.[1]

Catavu soon spoke with Melanie Walker, who was sitting on the front porch. *Id.* at ¶ 29.

Catavu told her that the boys could not be setting off fireworks in the street. *Id.* at ¶¶ 11, 30; *see also* Defs.' Resp. to Pl.'s SOF, at ¶ 7 (Dckt. No. 62). Melanie Walker "initially claimed that the kids were just playing with 'snaps.'" *See* Pl.'s Resp. to Defs.' SOF, at ¶ 30 (Dckt. No. 64).

Catavu wasn't buying it. He told Melanie Walker that he had seen children setting off fireworks, not throwing snaps. And he said that they needed to stop. *Id.* at ¶ 11, 30. Melanie Walker said that she understood. *Id.*; *see also* Defs.' Resp. to Pl.'s SOF, at ¶ 8.

That was the end of it – for the moment, anyway. Catavu walked away from the house, and got a house or two away. *See* Pl.'s Resp. to Defs.' SOF, at ¶ 31 (Dckt. No. 64); Defs.' Resp. to Pl.'s SOF, at ¶¶ 8, 10 (Dckt. No. 62).

Catavu says that he was looking for Jabari Walker, so that he could also tell him that the kids needed to stop. *See* Defs.' Resp. to Pl.'s SOF, at ¶ 8. As an aside, it's not entirely intuitive why Catavu walked away from the home to look for Walker, but it makes no difference.

***Walker's Return from the Backyard***

As Catavu walked away from the house, Jabari Walker emerged from the backyard. *See* Pl.'s Resp. to Defs.' SOF, at ¶¶ 12–13, 31 (Dckt. No. 64); Defs.' Resp. to Pl.'s SOF, at ¶ 9 (Dckt. No. 62).

Jabari Walker apparently caught Catavu's attention. The officer did an about-face and returned to the house. He asked to speak with Walker about "the children he was supervising lighting off fireworks in the middle of the street." *See* Pl.'s Resp. to Defs.' SOF, at ¶ 32 (Dckt. No. 64).

Off the bat, Catavu asked Walker for his name. *Id.* at ¶ 33. That introduction got the interaction off to a bad start.

---

[1] For example, Catavu says that he saw the two boys get out of the street and walk back onto the driveway. *See* Pl.'s Resp. to Defs.' SOF, at ¶ 27 (Dckt. No. 64). But Walker says that the boys were not in the street at this point. *Id.* As a second example, Catavu says that he saw Walker standing in the driveway. *Id.* Catavu says that Walker looked at him and walked through a gate into the backyard. *Id.* at ¶ 28. But Walker says that he was in the backyard when Catavu initially approached – although it's hard to see how Walker knew that the boys were not in the street, if he was in the backyard. *Id.* at ¶¶ 11, 27–28.

The two of them exchanged words. The parties disagree about who said what.

Catavu says that Walker offered to get his identification from inside the home. *Id.* And in response, Catavu said that simply giving his name would suffice. *Id.*

Walker offers a different version of what happened. As he tells it, Catavu asked him to produce identification. And Walker refused because he was on his private property. *Id.* at ¶¶ 15, 33; *see also* Defs.' Resp. to Pl.'s SOF, at ¶ 10 (Dckt. No. 62).

The parties also disagree about what happened next.

According to Catavu, Walker began "swiftly walking toward his front door." *See* Pl.'s Resp. to Defs.' SOF, at ¶ 34 (Dckt. No. 64). Catavu told Walker to stop, and followed him up to the door. *Id.* At that point, Walker opened the door, and "partially stepped inside." *Id.* Catavu again told him to stop. *Id.* Walker "stepped back onto the porch momentarily, but then ran into the home and slammed the door." *Id.*

Walker tells it differently. Walker takes issue with the notion that he walked "swiftly," but does not cite any evidence to dispute that characterization. *Id.* at ¶ 34. Walker also says that Catavu never told him to stop. *Id.* at ¶ 16 (citing Pl.'s Dep. Tr., at 63:14-19, 79:23 – 80:1 (Dckt. No. 51-1)).

But the parties do agree on a few points. There is no dispute that Walker went inside the home. There is no dispute that Catavu followed him up to the house, or that Walker closed the door on Catavu. *Id.* at ¶ 34. Walker also admits that he did not tell Catavu that he was going to get his ID. *Id.* at ¶ 16 (Dckt. No. 64) (citing Pl.'s Dep. Tr., at 62:17 – 63:2 (Dckt. No. 51-1)).

Up to that point, the parties had no physical interaction. But the parties disagree about whether Catavu attempted to grab Walker's arm.[2]

Shortly after, Walker came back outside, and he began recording with his phone.[3] *Id.* at ¶ 48. The video begins with Walker passing through the side gate from the backyard to the front yard. *Id.* at ¶ 49; Defs.' Ex. 6, at 00:00-13 (Dckt. No. 51-6).

---

[2] At one point, Walker says that Catavu grabbed his wrist while he was following Walker to the house. *See* Defs.' Resp. to Pl.'s SOF, at ¶ 12 (Dckt. No. 62) (citing Pl.'s Decl., at ¶ 7 (Dckt. No. 57-2)). But he didn't offer any supporting evidence. Walker cited a declaration saying that Catavu *tried* to grab his arm. *See* Pl.'s Decl., at ¶ 7 ("[Catavu] tried to follow me and grab my arm."). And elsewhere, Walker says that Catavu didn't touch him. *See* Pl.'s Dep. Tr., at 63:16 – 65:2 (Dckt No. 51-1) (stating that Catavu did not touch Walker at this time, and the closest Catavu got to the front door was "3 feet, 4 feet maybe").

[3] This video footage is of secondary importance here, because it does not "capture the circumstances which created probable cause" for Walker's arrest. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 62 (Dckt. No. 64) (denying that statement, but without offering any evidence against it). The key events underlying the arrest for obstruction took place *before* Walker went into the house to grab his cell phone.

Walker soon encountered Catavu standing on the driveway. Walker walked to the porch, and sat down. *See* Defs.' Ex. 6, at 00:15-30; Pl.'s Resp. to Defs.' SOF, at ¶ 36 (Dckt. No. 64); Defs.' Resp. to Pl.'s SOF, at ¶ 15 (Dckt. No. 62).

Catavu followed Walker, saying "sir, sir." *See* Pl.'s Resp. to Defs.' SOF, at ¶¶ 50–51 (Dckt. No. 64) (citing Defs.' Ex. 6, at 00:16-25 (Dckt. No. 51-6)).

Catavu again asked for Walker's identification. But Walker didn't provide it, saying, "I don't need no ID, I'm at home." *Id.* at ¶¶ 48, 52 (citing Defs.' Ex. 6, at 00:26 (Dckt. No. 51-6)). Walker did not have his ID with him. *Id.* at ¶ 20.

Things went south. The Walkers began shouting at Sergeant Catavu. *See* Defs.' Ex. 5, at 1:20-45 (Dckt. No. 51-5). An unnamed officer arrived. *Id.* at 1:40.

***Walker's Arrest***

Catavu told Walker, "You cannot disobey me . . . Sir, I wanted to have a courtesy conversation."

And then, Catavu placed him under arrest. "You're under arrest, step up." *See* Pl.'s Resp. to Defs.' SOF, at ¶ 53 (Dckt. No. 64) (citing Defs.' Ex. 6, at 00:29 – 1:06 (Dckt. No. 51-6)).

Catavu and the other officer arrested Walker. *Id.* at ¶¶ 21, 37; Defs.' Ex. 5, at 1:45 (Dckt. No. 51-5). Catavu based the arrest on obstructing an officer, 720 ILCS 5/31-1, and child endangerment, 720 ILCS 5/12C-5(a). *See* Pl.'s Resp. to Defs.' SOF, at ¶ 38 (Dckt. No. 64).

At the time, Catavu thought that there was probable cause for both charges. As he tells the story, Catavu saw Walker's two nephews playing with fireworks in the street. *Id.* at ¶ 25. To Catavu, Walker had engaged in child endangerment. *Id.* at ¶ 39. And he watched Walker walk "swiftly" back into the home after Catavu told him to stop, among other actions. *Id.* at ¶¶ 34, 40. To Catavu, the brisk walk to the home, when the officer was directing him to stop, looked like obstruction. *Id.* at ¶ 40.

The officers handcuffed Walker, and Catavu led Walker to his squad car. *Id.* at ¶¶ 22, 41. Along the way, Walker explained why he had "closed the door" on Catavu when Walker had retreated into his home. Walker has "security guard dogs" that he did not want to get loose. The dogs might have hurt the officer, or the officer might have hurt the dogs. *Id.* at ¶ 41; *see also* Defs.' Resp. to Pl.'s SOF, at ¶ 13 (Dckt. No. 62).

At long last, as he was seated in the squad car, Walker identified himself. *See* Pl.'s Resp. to Defs.' SOF, at ¶¶ 42, 58 (Dckt. No. 64); *see also* Defs.' Ex. 7, at 00:53 – 1:08 (Dckt. No. 51-7).

The video in the squad car was rolling. The footage captured Walker talking about the fireworks, saying: "I swear I won't let them pop no firecrackers no more, man." *See* Pl.'s Resp. to Defs.' SOF, at ¶ 59 (citing Defs.' Ex. 7, at 01:52 (Dckt. No. 51-7)).

Catavu wasn't satisfied. He responded, "Well, we should have had that discussion in your driveway before you went scurrying off into the house." *Id.* (citing Defs.' Ex. 7, at 01:56).

Walker went to the police station and was booked for child endangerment and obstruction. He stayed a few hours, before getting bailed out. *Id.* at ¶ 24. The charges were dropped the next day. *Id.* at ¶ 60.

### Officer Brian

Officer David Brian, another member of the Aurora Police Department, is also a defendant. But he played almost no role in the story.

Officer Brian learned about a request for backup, so he headed to Walkers' home. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 64). He arrived after Catavu had placed Walker under arrest. *Id.* at ¶¶ 23, 44; *see also* Defs.' Resp. to Pl.'s SOF, at ¶¶ 16–17 (Dckt. No. 62).

Officer Brian did not participate in Walker's arrest. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 23, 44 (Dckt. No. 64). He has no first-hand knowledge of the arrest. *Id.* at ¶ 45. He had no reason to believe that other officers lacked probable cause to arrest Walker, or that "anything improper had occurred." *Id.* at ¶ 46.

Walker admits that "[o]ther than arriving on the scene after [Walker] had already been placed under arrest, [Brian] had no involvement in the case." *Id.* at ¶ 47. Brian was not involved in transporting Walker to the police station. *Id.*

### Aftermath

Walker later sued, bringing a collection of claims. Some of the claims have fallen by the wayside.

Four claims remain: (1) unlawful seizure under section 1983 against Sergeant Catavu, Officer Brian, and the City; (2) false arrest under section 1983 against the same defendants; (3) failure to intervene against the same defendants; and (4) a state-law indemnification claim against the City. *Id.* at ¶ 4.

After discovery, the parties filed cross motions for summary judgment.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Walker brings four claims: unlawful seizure, false arrest, failure to intervene, and indemnification.

The latter two claims depend on the existence an underlying violation. After all, Officer #2 doesn't have a duty to intervene if Officer #1 wasn't doing anything wrong. In a similar vein, a municipality doesn't have a duty to indemnify an officer unless that officer needs indemnification for something.

So the question is whether Walker's first two claims about his arrest can get to a jury. Walker brings two claims about his arrest: an unlawful-seizure claim and a false-arrest claim. *See* Defs.' Mem. in Supp. of Defs.' Mtn. for Summ. J., at 11 (Dckt. No. 52). Only the arrest is at issue – Walker does not bring a claim about any other seizure.

Both claims fall under the Fourth Amendment, and the legal standard for each claim is the same. "'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment." *See Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) (citing *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)). Not every seizure is an arrest, but every arrest is a seizure.

The parties treat the two claims as one, and discuss them together. *See* Pl.'s Mem. in Supp. of Pl.'s Mtn. for Summ. J., at 6 (Dckt. No. 56) ("The probable cause inquiry for false arrest and illegal detention claims is the same.") (citing *Brooks v. City of Aurora*, 653 F.3d 478, 486 (7th Cir. 2011)); Defs.' Mem. in Opp. to Pl.'s Mtn. for Summ. J., at 10 (Dckt. No. 61) ("[T]hese two claims are treated as identical because they are both premised on Plaintiff's arrest, which is subject to only one standard of law.").

This Court will combine them, too. After addressing the two Fourth Amendment claims, the Court will turn to Walker's failure-to-intervene claim, and then the indemnification claim.

## I. Unlawful Seizure (Count I) and False Arrest (Count II)

Walker brings two Fourth Amendment claims against Sergeant Catavu, Officer Brian, and the City of Aurora. The Court will address the claims against each Defendant separately.

### A. Sergeant Catavu

The first issue is whether Walker's claims against Catavu can survive summary judgment. To get to a trial, Walker needs to overcome the affirmative defense of qualified immunity.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability," meaning that "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To overcome qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). "[O]nce a defendant claims qualified immunity, the burden is on the plaintiff to show that the right claimed to have been violated was clearly established." *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021).

As explained below, Catavu is entitled to qualified immunity. In a nutshell, there is a disputed question of fact about whether Catavu had probable cause to arrest Walker. But Walker did not carry his burden of establishing a violation of a clearly established constitutional right.

### 1. Violation of a Right

The first issue is whether Walker presented sufficient evidence that Catavu seized him in violation of the Fourth Amendment. The question boils down to whether Catavu had probable cause for the arrest. The answer depends on a disputed question of fact.

To prevail on a false-arrest claim, or an unlawful-detention claim about an arrest, "a plaintiff must show that there was no probable cause for his arrest." *See Nieta v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016).

Probable cause exists "when the facts and circumstances that are known to [the officer] reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). That question is a "common-sense inquiry requiring only a probability of criminal activity."

9

*Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)).

An officer has probable cause when that officer "has enough information to warrant a prudent person to believe that criminal conduct has occurred." *Id.* It is not necessary that "the officer's belief be correct or even more likely true than false, so long as it is reasonable." *See Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999).

Courts view the facts from the perspective of an "objectively reasonable police officer." *See Pryor v. Corrigan*, 124 F.4th 475, 487 (7th Cir. 2024). "Probable cause is 'assessed objectively' based on 'the conclusions that the . . . officer reasonably might have drawn from the information known to him.'" *Washington v. City of Chicago*, 98 F.4th 860, 875 (7th Cir. 2024) (alteration in original) (citation omitted).

Whether an officer has probable cause "depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Probable cause "exists when a reasonable officer with all the knowledge of the officers on the scene would have believed that the suspect committed an offense defined by state law." *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011). That is, an officer needs a reasonable belief that a person committed Crime X.

Catavu doesn't argue that he had probable cause to believe that Walker was shooting off fireworks in violation of state law. And Catavu doesn't argue that he had probable cause to arrest Walker for child endangerment, either. Child endangerment was one of the two original bases for the arrest at the time, but Catavu doesn't argue that point now.

Instead, Catavu argues that he had probable cause to arrest Walker for obstruction. That is, Catavu contends that he had a reasonable basis to believe that Walker had obstructed his investigation of child endangerment.

A person commits obstruction under Illinois law when he "knowingly . . . obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his or her official capacity." *See* 720 ILCS 5/31-1(a).

An "authorized act" includes an investigation, including an investigatory stop. *Id.* An officer can perform an investigatory stop when the officer has a reasonable suspicion that the person in question was involved in a crime. *See Jones*, 630 F.3d at 684; *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Reasonable suspicion means "'some objective manifestation that the person stopped' is involved in criminal activity." *See United States v. Price*, 184 F.3d 637, 640 (7th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Courts must "consider the totality of circumstances known to the officer at the time of the stop." *Id.* (citing *Cortez*, 449 U.S. at 417–18).

10

The reasonable-suspicion standard is objective, not subjective. *See United States v. Jackson*, 962 F.3d 353, 358 (7th Cir. 2020) ("[T]he reasonable suspicion inquiry is an objective standard[.]"); *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (same). The question is what a reasonable officer would have believed at the time, based on the facts and circumstances known to the officer in question. *See Jackson*, 962 F.3d at 357 ("This is an objective standard, based upon the facts available to the officers at the moment of the seizure.") (quoting *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015)).

Reasonable suspicion is less than probable cause. *Id.* ("[T]he level of suspicion the standard requires is . . . obviously less than is necessary for probable cause.") (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)).

A violation of the obstruction statute depends on a reasonable suspicion that someone had engaged in some *other* criminal activity. An officer "may arrest a person for obstructing . . . only if the initial stop was justified by reasonable suspicion of criminal activity." *Jones*, 630 F.3d at 684.

A person does not commit obstruction simply by walking away if the officer lacked a reasonable suspicion that the person had committed a crime. "[A]n officer may arrest a person for obstructing a peace officer if that person fails to comply with the Illinois stop and [identify] statute, but only if the initial stop was justified by reasonable suspicion of criminal activity." *Id.*

The first question, then, is whether Catavu had reasonable suspicion to investigate potential child endangerment, and to stop Walker as part of that investigation.

Based on the record, Catavu had reasonable suspicion to investigate potential pyrotechnics. Catavu presented evidence that he heard fireworks. He saw children playing near the Walkers' home, and he believed that they were playing with fireworks.

Walker takes issue with the exact location of the children, meaning whether they were playing in the street or in the driveway. And he takes issue with the notion that the children were setting off fireworks. Walker says that they were playing with snaps, which are legal.

Even so, Walker doesn't take issue with what Catavu heard. Catavu presented evidence that he "heard fireworks being set off on Charles Street." *See* Pl.'s Resp. to Defs.' SOF, at ¶ 25 (Dckt. No. 64). Walker admits that he "cannot attest to what Catavu heard." *Id.* And based on what he saw and heard, Catavu believed at the time that the children were playing with fireworks, not snaps. *Id.* at ¶ 30.

Lighting fireworks is a potentially dangerous activity that could "endanger [a] child's life or health." *See* 720 ILCS 5/12C-5(a)(2). Allowing children to play with fireworks could constitute child endangerment.

It does not matter if the officer was mistaken, and the children were merely playing with snaps. An officer doesn't need to be correct to have reasonable suspicion. After all, that's why it is called reasonable *suspicion*.

11

It is enough if the officer formed a reasonable belief that criminal activity was afoot. Based on the record, Catavu had a reasonable suspicion that the children were setting off fireworks. He had a reasonable suspicion of child endangerment, too.

The parties tussle over whether anyone was supervising the children, but it makes no difference. The lack of adult supervision can be child endangerment. But an adult could commit child endangerment even if that adult was supervising the child. Adult supervision doesn't necessarily eliminate the danger of fireworks. Depending on the adult, it might make matters *worse*.

Allowing a child to light an explosive device can constitute child endangerment, regardless of whether the adult is two feet or two hundred feet away. The question is whether the adult "cause[d] or permit[ted] a child to be placed in circumstances that endanger the child's life or health." *See* 720 ILCS 5/12C-5(a)(2).

Walker goes to great lengths to undermine the legitimacy of the investigation. He points out that Catavu "left the property" after talking with Melanie Walker, walked a house or two away, and later came back. *See* Pl.'s Mem. in Supp. of Pl.'s Mtn. for Summ. J., at 8–9 (Dckt. No. 56). The parties also disagree about whether Jabari Walker was in the backyard at the time. *See* Pl.'s Resp. to Defs.' SOF, at ¶¶ 28, 31 (Dckt. No. 64).

Those facts don't matter. An investigation doesn't have to be a one-and-done operation. Even if Catavu walked away from the home, nothing prevented him from returning and talking with Walker.[4]

Putting it all together, Catavu had a reasonable basis to investigate child endangerment. He heard fireworks, and saw children playing nearby. He had a basis to investigate whether the adults were allowing the children to do a dangerous activity.

The next question is whether Catavu had probable cause to believe that Walker knowingly obstructed that investigation. Again, the statute prohibits a person from "knowingly . . . obstruct[ing] the performance by one known to the person to be a peace officer . . . of any authorized act within his or her official capacity." *See* 720 ILCS 5/31-1(a).

Illinois courts have fleshed out the meaning of obstruction under the statute, and have recognized a number of important carve-outs.

For starters, walking away from an officer is not obstruction when the officer lacks a reasonable suspicion that the person is engaged in criminal activity. *See People v. Peterson*, 2013 WL 474881, at ¶ 13 (Ill. App. Ct. 2013) ("Quietly walking away from an officer, thereby ending a consensual encounter initiated by a police officer, is not unlawful [under the Illinois obstruction statute]."). Passing a cop on the street, ignoring a friendly greeting, and going on your merry way is not obstruction. You're free to walk away.

---

[4] The parties disagree about lots of other immaterial facts, too. For example, Catavu says that he only asked Walker for his name, not his identification. *See* Defs.' Resp. to Pl.'s SOF, at ¶ 10 (Dckt. No. 62). It makes no difference.

12

In a similar vein, a mere failure to provide identification generally is not obstruction, except during traffic stops.[5]  *See People v. Fernandez*, 963 N.E.2d 1058, 1061 (Ill. App. Ct. 2011) ("[The] defendant could not be convicted of obstruction for merely refusing to identify himself and refusing to provide identification . . . ."); *People v. Hall*, 191 N.E.3d 596, 605 (Ill. App. Ct. 2021) (reversing a conviction for obstruction where the criminal complaint alleged "only that [the defendant] failed to produce identification as ordered"); *People v. Ramirez*, 502 N.E.2d 1237, 1239 (Ill. App. Ct. 1986) (reversing a conviction where the defendant was charged with "obstructing a peace officer based on her giving an officer a false name"); *see also People v. Coates*, 2025 WL 1111638, at ¶¶ 39–42 (Ill. App. Ct. 2025) (upholding a conviction for obstruction after finding that a sovereign citizen's failure to provide identification on a traffic stop constituted a "material hindrance of an officer's authorized acts").

Arguing with a police officer, in and of itself, does not constitute obstruction, either.  *See Hall*, 191 N.E.3d at 605 ("[T]he obstruction statute does 'not proscribe mere argument with a policeman.'") (quoting *People v. Raby*, 240 N.E.2d 595, 600 (Ill. 1968)); *People v. McCoy*, 881 N.E.2d 621, 630 (Ill. App. Ct. 2008) ("Verbal resistance or argument alone, even the use of abusive language, is not a violation of the statute."); *People v. Hilgenberg*, 585 N.E.2d 180, 183 (Ill. App. Ct. 1991) ("Mere refusal to answer a police officer, in the absence of a physical act, may be deemed tantamount to argument which is not a violation of the statute.").

Illinois cases go back and forth about whether the obstruction statute requires a physical act.  Recent Illinois cases recognize that non-physical acts can constitute obstruction.  *See, e.g.*, *People v. Lazio*, 2025 WL 1392241, at ¶ 32 (Ill. App. Ct. 2025) ("Obstruction of a peace officer can be a nonphysical act but must actually hinder or impede the officer's authorized act.") (quoting *People v. Willis*, 2025 WL 763349, at ¶ 30 (Ill. App. Ct. 2025)).

It's easy to think of examples of how a person could obstruct an investigation through a non-physical act.  Lying is a good example.  So is suborning perjury, or erasing computer files.

But plenty of Illinois cases say that obstruction requires a physical act.  *See, e.g.*, *Hilgenberg*, 585 N.E.2d at 183 ("A violation of this section requires an act of physical resistance."); *McCoy*, 881 N.E.2d at 630 ("[T]he statute prohibits a person from committing a physical act of resistance or obstruction – a physical act that impedes, hinders, interrupts, prevents or delays the performance of the officer's duties, such as going limp, forcefully resisting arrest, or physically helping another party to avoid arrest."); *Kies v. City of Aurora*, 156 F. Supp. 2d 970, 982 (N.D. Ill. 2001) ("[O]bstruction requires a *physical act* that impedes, hinders, interrupts, prevents, or delays the performance of an officer's duties.") (emphasis in original) (citing *Hilgenberg*, 585 N.E.2d at 183).

---

[5]  Other states do criminalize a mere failure to identify oneself in response to an officer's request.  The Supreme Court addressed the constitutionality of such statutes a few decades ago.  A state can criminalize a failure to identify oneself as long as the officer has reasonable suspicion of a crime and the request for identification is "reasonably related to the circumstances justifying the stop."  *See Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 188 (2004).  But the Illinois statute doesn't go that far.  Illinois law also requires a physical act.

The cases that require a physical act typically involve an in-person, face-to-face encounter with an officer on the street. That context is key. The idea is that a person doesn't commit obstruction by simply refusing to interact with a police officer, and standing there mum.

The physical act can include leaving the scene. Fleeing from an officer can be obstruction under Illinois law. *See, e.g.*, *People v. Bell*, 2020 WL 1951931, at ¶ 26 (Ill. App. Ct. 2020) ("The defendant's on-foot flight from a police officer . . . was an act of obstruction . . . ."); *Brown v. City of Chicago*, 2020 WL 6135468, at *5 (N.D. Ill. 2020) ("[F]leeing from police is a form of resisting or obstructing a police officer."); *People v. Johnson*, 945 N.E.2d 2, 12 (Ill. App. Ct. 2010) ("Since the police officer has the right to detain him, flight by [a car] passenger has been held to constitute an offense of obstruction of a peace officer . . . ."); *Pryor v. Corrigan*, 2021 WL 1192581, at *12 (N.D. Ill. 2021) ("Flight following a lawful stop is obstruction, because fleeing is the opposite of stopping."), *aff'd*, 124 F.4th 475 (7th Cir. 2024).

Walking away can be a physical act of obstruction, too. But leaving the scene is obstruction only if the person was not free to leave.

If an officer is performing a lawful *Terry* stop, then the person is not free to go. And if the person is not free to go, then walking away can constitute obstruction. *See Thompson v. Wagner*, 2002 WL 460871, at *6 (N.D. Ill. 2002) ("When Thompson attempted to walk away, she committed the physical act necessary to constitute obstruction of a peace officer."), *rev'd*, 319 F.3d 931 (7th Cir. 2003).[6]

The parties agree that Walker did engage in a physical act. He didn't merely argue with Catavu, or decline to give his name or provide an identification card. He walked away.

The parties agree that Walker spoke with Catavu, and then walked into his home and closed the door. *See* Pl.'s Resp. to Defs.' SOF, at ¶ 34 (Dckt. No. 64). The parties disagree about how swiftly Walker went away, but the speed isn't dispositive. Slow people can obstruct, too.

Walker committed obstruction by walking away only if Walker wasn't free to go. Again, ending a consensual interaction isn't obstruction. But leaving the scene can constitute obstruction if the person was detained. *See Catledge v. City of Chicago*, 428 F. App'x 646, 648 (7th Cir. 2011) (citing *United States v. Drayton*, 536 U.S. 194, 200 (2002) and *United States v. Douglass*, 467 F.3d 621, 623 (7th Cir. 2006)) (discussing "consensual encounters where citizens are free to turn and walk away from the police"); *People v. Smith*, 780 N.E.2d 707, 711 (Ill. App.

---

[6] The district court in *Thompson* ruled that walking away from an officer was a "physical act necessary to constitute obstruction." *See Thompson*, 2002 WL 460871, at *6. By the look of things, the district court took it as a given that the person was detained. The Seventh Circuit reversed the district court in *Thompson* because it determined that the person was never seized. *See Thompson*, 319 F.3d at 396. And if the person wasn't seized, then the person was free to walk away. The Seventh Circuit didn't reject the notion that walking away was a physical act. Instead, the Seventh Circuit held that walking away can't constitute obstruction if the person was free to walk away (because the person wasn't detained at all). So the district court's opinion in *Thompson* represents valid persuasive authority for the limited notion that walking away can be a physical act of obstruction when a suspect is lawfully stopped.

14

Ct. 2002) (citing *Florida v. Royer*, 460 U.S. 491, 497–98 (1983)) (discussing a consensual encounter and determining that the defendant was "free at that point to answer the officers' questions or ignore them; he could also remain where he was or simply walk away").

The Seventh Circuit teased out this distinction in *Thompson v. Wagner*, 319 F.3d 931 (7th Cir. 2003). There, the Seventh Circuit held that a person did not commit obstruction by simply walking away from an officer, because the person was not detained:

> Mrs. Thompson voluntarily went with the officers to the waiting area. She was told she was *not under arrest*. When she wanted to get up and go to call her husband, she had a *right to do so*. To hold otherwise would be to say that anyone who decides to terminate a voluntary conversation with a police officer commits a crime. It would not be reasonable – or consistent with the Fourth Amendment – for a police officer to hold this view.

*Id.* at 936 (emphasis added).

The question boils down to whether Catavu had detained Walker. If Walker wasn't detained, then he could go. If Walker was detained, then he had to stay put.

So, was Walker stopped before he walked away? Figuring out the answer is not a snap.

The well-worn standard for this determination is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Hess v. Garcia*, 72 F.4th 753, 763 (7th Cir. 2023); *Carlson v. Bukovic*, 621 F.3d 610, 619 (7th Cir. 2010).

The existence of a stop is in the eye of the stoppee, not the stopper. The question is not whether a reasonable officer would think that he was stopping someone. The question is whether a reasonable person would think that he was getting stopped by an officer.

Maybe a reasonable stoppee would have the same view as a reasonable officer. But not always. At the end of the day, the perception of the person getting stopped is what matters, not the perception of the officer doing the stopping.

The standard is objective, not subjective. The question is what a reasonable person standing in the stoppee's shoes would have believed, based on the facts and circumstances at the time, not what the particular stoppee believed at the time.

A totality-of-the-circumstances standard applies, so the question often requires an answer from a jury. "The determination whether an encounter between an individual and a law enforcement officer constitutes a 'seizure' is an extremely factual one, depending on the circumstances of each particular case." *See United States v. Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars, U.S. Currency*, 710 F.2d 283, 288 (7th Cir. 1983).

Based on the record, there is a genuine dispute of material fact about whether a reasonable person in Walker's shoes would have felt free to go.

The record includes some interesting wrinkles. Each party puts forward a fact suggesting that Walker *wasn't* free to go. But each party disagrees with the fact put forward by the other party. So each fact is disputed.

On the one hand, Catavu offered evidence that he told Walker to stop. A verbal command to stay put could form a reasonable belief by the listener that he was not free to go. Even so, whether Catavu gave that directive is a disputed fact. Walker denied that Catavu said any such thing, and he pointed to countervailing evidence. *See* Pl.'s Resp. to Defs.' SOF, at ¶ 16 (Dckt. No. 64) (citing Pl.'s Dep. Tr., at 63:14-19, 79:23 – 80:1 (Dckt. No. 51-1)).

On the other hand, Walker offered evidence that Catavu *tried* to grab his wrist. An attempt by an officer to physically retrain someone could give rise to a reasonable belief that that person wasn't free to go. But Catavu denies that he touched Walker before Walker went inside the home. *See* Defs.' Resp. to Pl.'s SOF, at ¶ 12 (Dckt. No. 62) (citing Pl.'s Dep. Tr., at 64:25 – 65:2 (Dckt. No. 51-1)).[7]

A reasonable jury could reach different conclusions about what Catavu said to Walker, and about whether Catavu attempted to physically restrain Walker. A jury might decide that Catavu never told Walker to stop, and never tried to restrain him.

In that case, a reasonable jury might find that a reasonable person in Walker's position would have felt free to go. The absence of a restraint is freedom, and if Walker had the freedom to go, then he didn't obstruct an investigation by leaving.

The bottom line is that a jury would need to sort it out. It is a disputed question of fact whether a reasonable person, standing in Walker's shoes, would have felt free to walk away. If a reasonable person would have felt free to walk away, then a reasonable person wouldn't have felt detained. And in that case, the officer would have lacked probable cause to believe that Walker was violating the obstruction statute.

For the same reasons, there is a disputed question of fact about whether Walker "knowingly" obstructed the investigation. *See* 720 ILCS 5/31-1(a). A reasonable jury might find that Catavu did not give a verbal command to Walker to stop. And a reasonable jury might find that Catavu did not attempt to physically restrain Walker. In that case, a reasonable jury might find that Catavu lacked a reason to think that Walker knowingly obstructed an investigation, because Walker had no reason to think that he couldn't walk away.

The answers to those questions of fact would determine whether Catavu had probable cause to believe that Walker acted knowingly. That standard isn't particularly high. Knowledge is a mental state, and when it comes to *mens rea*, an officer only needs "some evidence" to

---

[7] The record is a muddy track here. Walker's statement of facts says that Catavu "grabbed his wrist." *See* Pl.'s SOF, at ¶ 12 (Dckt. No. 57). But the supporting declaration says that Catavu "tried" to grab Walker's arm. *See* Pl.'s Decl., at ¶ 7 (Dckt. No. 57-2) ("[Catavu] tried to follow me and grab my arm.").

believe that the suspect acted with the requisite mental state. *See Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019). Still, on this record, figuring out whether the officer had some evidence of Walker's knowledge would require a jury to roll up their sleeves.

In short, there is a genuine dispute of material fact about whether a reasonable person in Walker's shoes would have believed that he was detained. If Walker was not detained, then he was free to walk away, and walking away would not give rise to probable cause to arrest him for obstruction. *See Thompson*, 319 F.3d at 936.

True, probable cause is a deferential standard. It doesn't require certainty. It doesn't require the officer to be correct, either. It doesn't even require the officer to be more likely correct than not. *See Qian*, 168 F.3d at 953 (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

But probable cause also depends on the facts, and what a reasonable officer would have concluded based on those facts. Based on the record, there is a genuine issue of material fact about whether Catavu had probable cause to arrest Walker for obstruction. The answer depends on whether a reasonable person would have felt detained, and the facts on that issue tug in different directions.

## 2.      Clearly Established Right

The next question is whether Walker demonstrated a violation of a clearly established constitutional right. And that's where Walker's claim runs into trouble.

An officer enjoys qualified immunity unless a plaintiff shows that the officer violated a clearly established constitutional right. *See Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (en banc) (quoting *al-Kidd*, 563 U.S. at 735).

The burden rests with the plaintiff, not the officer, to pin down the right. Walker bears the burden of defining the right with specificity and showing that it was clearly established at the time of the incident. *See Pryor v. Corrigan*, 124 F.4th 475, 488 (7th Cir. 2024); *see also Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) ("Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it.").

A plaintiff must "show[ ] that there is a case 'on point or closely analogous' that allows [the Court] to conclude that a reasonable government employee would or should know that her conduct is unlawful." *See Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017) (quoting *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007)).

Invoking broad constitutional principles writ large doesn't cut it. The clearly established constitutional right must be "defined with specificity." *See Smith v. Finkley*, 10 F.4th 725, 742 (7th Cir. 2021).

The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S.

765, 779 (2014) (quoting *al-Kidd*, 563 U.S. at 742). A district court must "analyze whether precedent squarely governs the facts at issue, mindful [to] . . . not define clearly established law at too high a level of generality." *See Finkley*, 10 F.4th at 742 (citation omitted).

A plaintiff cannot overcome an assertion of qualified immunity based simply on the right to be free from arrest without probable cause. That's a high level of generality, and it's not much better than simply invoking the Fourth Amendment. Instead, a plaintiff must come forward with case law that clearly establishes a right to be free from arrest in a substantially similar set of facts.

As an aside, the qualified immunity analysis has an air of artificiality about it. Police officers don't roll around town with Westlaw at their fingertips. They haven't memorized Supreme Court and Seventh Circuit case law with any level of specificity. They aren't lawyers, and they need to make snap decisions at a moment's notice. They're unlikely to know what federal courts have said in any particular case in the past few years.

Lawyers often spend lots of time researching whether officers committed a constitutional violation. Everything about leisurely, comfortable legal-research projects underscores the challenges facing officers on the streets. It's asking a lot of police officers to know the answer to constitutional questions on the fly, when facing live-fire activity without the benefit of legal training, without the luxury of time, and without the caffeinated comforts of a lawyer's office.

It's a stretch to imagine a world in which police officers have command over the nuances of case law, especially in the heat of the moment. The notion that police officers have any idea what federal courts have said or done in any case is a fiction. But if it's a fiction, it's apparently a best seller, because courts talk as if officers are following along in real time.

It might be unreasonably generous to expect officers to know the comings and goings of ever-evolving, ever-flowing case law. Maybe the standard indulges a fiction. But if so, officers might be the beneficiaries of the fiction, because they receive a king-sized blanket of protection. They receive qualified immunity *unless* there is a case on point. So, from a liability standpoint, they're already on third base, with a big lead toward home plate.

Putting that aside, the standard for qualified immunity is familiar. And it's high. Walker has the burden of showing the existence of a clearly established constitutional right. He did not carry that burden.

Walker's first attempt doesn't get him very far. He defined the right as the "right to be free from arrest absent probable cause." *See* Pl.'s Mem. in Opp. to Defs.' Mtn. for Summ. J., at 11 (Dckt. No. 65). That high level of generality touches the constitutional stratosphere.

Shifting gears, Walker argues that Catavu "misinterpreted an unambiguous statute." *Id.* at 5. The idea seems to be that Catavu mistakenly believed that snaps were fireworks.

Qualified immunity does not protect objectively unreasonable mistakes of law. It only protects reasonable mistakes of law. *See Ziglar v. Abbasi*, 582 U.S. 120, 150–51 (2017) ("The

doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'") (citation omitted); *United States v. Stanbridge*, 813 F.3d 1032, 1038 (7th Cir. 2016) ("[The defendant's] mistake of law on this point was unreasonable and thus cannot be a basis for upholding the seizure.").

Still, Walker's argument overlooks the record. Catavu wasn't mistaken about the law. He thought – correctly – that fireworks are illegal. And based on what he saw and heard, he believed that the children were playing with fireworks.

As a factual matter, nothing in the record suggests that Catavu thought that the children were playing with snaps. As a legal matter, nothing in the record suggests that Catavu thought that snaps were illegal.

Instead, the undisputed record confirms that Catavu believed that he heard fireworks, and he thought that the children were playing with fireworks. That's enough for reasonable suspicion.

And in any event, Catavu isn't defending the notion that he had probable cause to arrest Walker for child endangerment. The question is whether arresting Walker for obstruction (not child endangerment) under this set of facts violated a clearly established right.

As a final salvo, Walker argues that a police officer cannot arrest someone for merely failing to present identification, citing the Supreme Court's decision in *Kolender v. Lawson*, 461 U.S. 352 (1983). But *Kolender* addressed the doctrine of void for vagueness, not the scope of the Fourth Amendment. *Id.* at 353 ("We conclude that the statute . . . is unconstitutionally vague . . . by failing to clarify what is contemplated by the requirement that a suspect provide a 'credible and reliable' identification.").

Decades later, the Supreme Court held that the Fourth Amendment does not prohibit arresting someone who fails to identify himself during a *Terry* stop. *See Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 188 (2004). So, a state can criminalize a mere failure to provide identification during a *Terry* stop without running afoul of the Fourth Amendment.

True, the Illinois obstruction statute doesn't go that. A mere failure to provide identification isn't obstruction. But it can become obstruction if the person takes a physical act.

And that's what happened here. Catavu didn't simply arrest Walker for failing to give identification. The arrest took place after Walker walked away. Walker has not come forward with any case law confirming that such an arrest violates a clearly established right.

To overcome qualified immunity, Walker would have needed to come forward with a case establishing that a police officer, in the midst of a legitimate investigation, lacks probable cause to arrest someone for obstruction after that person refuses to give his name and retreats into his home. Walker didn't, so he didn't carry his burden.

In sum, Walker failed to demonstrate that a reasonable officer, standing in Catavu's shoes, would have known that arresting Walker under this set of facts would cross a clearly established constitutional boundary. Walker cannot overcome qualified immunity because he did not demonstrate a violation of a clearly established constitutional right.

### B.     Officer Brian

Walker's next claim is against Officer Brian. The claim barely gets off the ground, for a simple reason. Brian showed up at the scene after the arrest.

Section 1983 "creates a cause of action based on personal liability and predicated upon fault." *See Milchtein v. Milwaukee County*, 42 F.4th 814, 824 (7th Cir. 2022) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). "An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983); *see also Baldwin v. Greenfield Police Dep't*, 2019 WL 4737073, at *7 (S.D. Ind. 2019) ("[W]hen an officer does not personally effectuate an arrest, he cannot be found liable for false arrest or false imprisonment.").

The standard is the flipside of "you break it, you buy it." If an officer didn't play a personal role in the events that gave rise to the claim, then that officer cannot have liability under section 1983. No role, no liability.

The undisputed facts confirm that Brian played no meaningful role in the key events. Officer Brian did not participate in the arrest. He arrived after Catavu arrested Walker, and "played no part in transporting" Walker. *See* Pl.'s Resp. to Defs.' SOF, at ¶¶ 44–47 (Dckt. No. 64). Brian "had no first-hand knowledge regarding the circumstances of [Walker]'s arrest, either." *Id.*

Based on the record, Walker has no claim. Brian did not participate in Walker's arrest, so he did not "cause[] or participate[]" in any constitutional deprivation. *See Wolfe-Lillie*, 699 F.2d at 869.

Walker bobs and weaves when it comes to the claims against Brian. At one point, Walker seems to drop the claims against Brian altogether. *See* Pl.'s Mem. in Opp. to Summ. J., at 11 (Dckt. No. 65) ("Plaintiff has decided to not pursue claims against [O]fficer Brian.").

Elsewhere, Walker asserts that his arrest was "witnessed and encouraged by Officer Brian." *See* Pl.'s Mem. in Supp. of Summ. J., at 10 (Dckt. No. 56). But that assertion lacks evidentiary support in the record.

To support this argument, Walker cites "SOF ¶ 5." *Id.* But that idea that Walker's arrest was "witnessed and encouraged by Officer Brian" appears nowhere in Walker's own statement of facts, or in his response to Defendants' statement of facts, or in his counter-affidavit that Defendants treated as a statement of additional facts. *See generally* Pl.'s SOF (Dckt. No. 57), Pl.'s Resp. to Defs.' SOF (Dckt. No. 64); Pl.'s Aff. (Dckt. No. 63).

The closest Walker comes to offering factual support is a different paragraph in his statement of facts.

There, Walker says that "[a]s soon as Officer Brian arrived, Officer Catavu put [] Walker in handcuffs." *See* Pl.'s SOF, at ¶ 17 (Dckt. No. 57) (citing Melanie Walker Decl., at ¶ 14 (Dckt. No. 57-3)). But the declaration in question doesn't support that proposition at all. *See* Melanie Walker Decl., at ¶ 14 ("My husband was arrested when he came back out of the house.").

Maybe Walker intended to cite his own declaration instead. That declaration does say that "Officer Obrien [sic] saw [the other officers] walking me and he did not intervene." *See* Pl. Decl., at ¶ 14 (Dckt. No. 57, Ex. 2, at 23 of 53).

Even so, Walker's declaration does not support a claim against Brian for false arrest. Walker admitted that he was already under arrest when Brian arrived. *Id.* at ¶ 13 ("I was arrested when the other officers arrived."); *see also id.* at ¶ 14 (stating that the other officers were already "walking me" when Brian arrived).

The lack of personal involvement is fatal, even before getting to qualified immunity. But qualified immunity would protect Brian, too. Once again, Walker has failed to come forward with a case establishing a clearly established right in similar circumstances. He didn't come forward with case law saying, for example, that an officer had a duty to intervene and free a person who was already under arrest in similar circumstances.

In the end, Walker came forward with no evidence that Brian played a role in placing him under arrest. So he has no claim.

## C.     City of Aurora

One final loose end remains. Walker appears to bring Count I and Count II against the City, too. But a municipality cannot be held liable under section 1983 in the same way as a natural person.

"[T]he only way a municipality can be held liable under Section 1983 is through a *Monell* claim." *See, e.g.*, *Harris v. City of Chicago*, 2021 WL 1192438, at *5 (N.D. Ill. 2021). Walker did not bring Count I and II as *Monell* claims, so those claims fail against the City.

Likewise, a municipality does not face *respondeat superior* liability for the torts of its employees. *See Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021); *see also Averhart v. Sheahan*, 2004 WL 2044281, at *6 (N.D. Ill. 2004) ("It is well established that a local government unit may not be held liable under § 1983 under the doctrine of respondeat superior."), *aff'd*, 156 F. App'x 842 (7th Cir. 2005). Even if *respondeat superior* existed, it wouldn't apply here, because Walker has no claim against the officers.

To sum it all up, Walker has fallen short on his Fourth Amendment claims. The Court grants Defendants' motion for summary judgment on the claims of unlawful detention and false arrest (Count I & II), and denies Walker's motion for summary judgment.

## II. Failure to Intervene (Count III)

Walker also brings a failure-to-intervene claim against all Defendants.

To show a failure to intervene, Walker "must demonstrate that the Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

A duty to intervene presupposes a constitutional violation. A "plaintiff must establish an underlying constitutional violation in order to succeed on a claim of failure to intervene." *See Bandala-Martinez v. Fry*, 2020 WL 1915275, at *4 (S.D. Ill. 2020) (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)); *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (affirming summary judgment against a failure-to-intervene claim because "no reasonable jury could find that [another defendant] violated [the plaintiff]'s constitutional rights"); *Polland v. City of Chicago*, 2025 WL 947919, at *6 n.2 (N.D. Ill. 2025) ("[A] failure to intervene claim fails if no constitutional rights violation occurred.").

No constitutional violation, no failure to intervene (to prevent a constitutional violation).

The Court already granted summary judgment for Defendants on Walker's unlawful-seizure (Count I) and false-arrest (Count II) claims. So there is no "underlying constitutional violation" and Walker's failure-to-intervene claim fails as a matter of law. *See Bandala-Martinez*, 2020 WL 1915275, at *4.

The failure-to-intervene claim fails for other reasons, too.

Walker has no failure-to-intervene claim against Catavu for Catavu's own conduct. A person has no duty to intervene to prevent *his own* violation. *See Velez v. City of Chicago*, 2023 WL 6388231, at *15 (N.D. Ill. 2023) ("[O]ne cannot fail to intervene in one's *own* conduct.") (emphasis in original) (collecting cases); *Collins v. City of Chicago*, 2024 WL 5007836, at *10 (N.D. Ill. 2024) ("Styczynski cannot 'fail to intervene' against his own conduct . . . because liability attaches where the officer fails to intervene 'to prevent *other* law enforcement officers' from infringing the constitutional rights of citizens[.]'") (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Walker also has no failure-to-intervene claim against Officer Brian. A person has no duty to intervene to prevent conduct when that person wasn't even there at the time. *See, e.g.*, *Moore v. City of Chicago*, 209 F. Supp. 3d 1016, 1033 (N.D. Ill. 2016) ("Police officers who were not present on the scene cannot be held liable for failing to intervene in another officer's unconstitutional acts.") (citing *Yang*, 37 F.3d at 285); *Banks v. Dart*, 2014 WL 6461582, at *3 (N.D. Ill. 2014) ("First, it is undisputed that defendants were not present during the [] incident, and thus cannot be liable for failing to intervene in it.").

The City cannot be liable for failing to intervene, either. Again, municipalities are not liable under section 1983 except through *Monell* claims, and Walker didn't bring a *Monell* claim.

The Court grants Defendants' motion for summary judgment on the failure-to-intervene claim (Count III), and denies Walker's motion for summary judgment.

### III.    Indemnification (Count IV)

The last claim is an indemnification claim against the City of Aurora.

A municipality must "pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable."  *See* 745 ILCS 10/9-102.

The claims against the officers do not survive, so the indemnification claim does not survive, either.  There is nothing left for the City to Aurora to indemnify.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted, and Plaintiff Walker's motion for summary judgment is denied.


Date:    July 25, 2025                              _____

Steven C. Seeger
United States District Judge